Jaclynn MARTINEZ, Individually and as Next Friend of Minors Dylan Martinez and Christine Martinez, Appellant

v.

HARRIS COUNTY, Texas, Appellee

NO. 01-16-00140-CV

Court of Appeals of Texas, Houston (1st Dist.).

Opinion issued June 13, 2017

Rehearing Overruled July 13, 2017

558

Arshad Ramji, Kenneth Richard Baird, for Appellant.

Michael R. Hull, Bruce S. Powers, Houston, for Appellee.

Panel consists of Justices Higley, Massengale, and Huddle.

## OPINION

Michael Massengale, Justice

Jaclynn Martinez sued Harris County for injuries she and her two children sustained when her car was struck by a deputy constable who was pursuing a fleeing motorist. The trial court granted the county summary judgment on the basis of governmental immunity. Martinez contends that the trial court erred.

We conclude that the county conclusively established that its officer, who was driving a car, acted in good faith when, pursuant to policies established to promote the safety of law-enforcement officers, he took over a pursuit previously initiated by another law-enforcement officer on a motorcycle. We further conclude that over the course of the short pursuit, no subsequent developments altered the balance of need and risk factors sufficiently to require an end to the chase. Because Martinez failed to introduce controverting proof that no reasonable person in the officer's position could have thought the circumstances justified his actions, we affirm the judgment.

### Background

Harris County Deputy Constable C. Johnson was on patrol in a cruiser late one

Friday afternoon when he encountered a high-speed police pursuit in progress. Because this appeal concerns a dispute over the deputy constable's good faith in the exercise of his discretionary duties by joining and continuing the pursuit, we focus on the information that was known to him, and we disregard information which was unknown to him at the time. *See Telthorster v. Tennell*, 92 S.W.3d 457, 465 (Tex. 2002).

A Houston Police Department motorcycle officer with his emergency lights activated was pursuing the driver of a Dodge Caliber with paper license plates. Because the county and the city used different radio systems, Johnson could not communicate with the motorcycle officer directly. However, he joined and took the lead in the pursuit, in compliance with the Harris County Constable's guidelines which provided that a constable in a cruiser generally should take over any pursuit initiated by a law-enforcement officer on a motorcycle. The policy promotes the safety of motorcycle officers, for whom a pursuit is more dangerous as compared to officers driving cars.

In addition to this general policy, Johnson considered several additional factors when he decided to join and continue the pursuit. He considered the time of day, traffic conditions, severity of the crime, risk that the pursuit posed to the suspect and others, and public safety. It was shortly after 5:00 p.m. at the end of the work week; however, traffic was light to moderate despite the nearness of rush hour. It was dry and sunny. While Johnson was unaware of what had caused the initiation of the pursuit, he was able to observe that the fleeing driver apparently was committing the felony offense of evading arrest or detention.[1]

The fleeing driver posed a danger to the general public. While speeding, he forced several other drivers from the road during the pursuit. Though Johnson recognized that the pursuit itself posed some risk, he concluded that the fleeing driver posed a greater risk to the public.

Johnson initially pursued the fleeing driver along the service road of an interstate highway, then through a residential neighborhood, and finally into a more commercial area. He continually reevaluated the need to pursue the fleeing driver and the risks involved throughout the pursuit. As they approached the intersection of Telephone Road and Woodridge Drive, the traffic light was red. Initially, Johnson believed that the driver was going to run the red light. However, the fleeing driver abruptly turned right on Woodridge Drive from Telephone Road's rightmost northbound lane. When Johnson decelerated and tried to follow from the left northbound lane of Telephone Road, he struck Jaclynn Martinez's car, a Kia Soul. Martinez, who had her children in her car with her, was stopped at a red light in the left-turn lane of Woodridge Drive. When Johnson turned onto Woodridge Drive, his front bumper struck the front bumper of her car and pushed it backward into a truck directly behind her, as depicted in the crash report:

---

1. "A person commits an offense if he intentionally flees from a person he knows is a peace officer or federal special investigator attempting lawfully to arrest or detain him." TEX. PENAL CODE § 38.04(a). The offense is a felony if the actor uses a vehicle while in flight. *See id.* § 38.04(b).

Diagram Drawn Not To Scale

Woodridge

Golfway St

Johnson testified that when he made the decision to continue pursuing the fleeing driver onto Woodridge Drive, he thought the space occupied by Martinez's vehicle, in front of the truck, was empty. Though he did not realize at that time that his view was obstructed, Johnson later identified two obstructions that accounted for his failure to see Martinez's small car—the fleeing driver's vehicle to his right and a one-foot decline in the road's elevation where Martinez was stopped. The fleeing driver's car and the dip in the road effectively concealed Martinez's car from Johnson's view due to its relatively low profile. According to Johnson, he did not see Martinez until he struck her, or immediately before the collision.

The record does not disclose precise information about the duration of Johnson's pursuit. He testified in his deposition that the portion of the pursuit that went through a neighborhood lasted three minutes. He testified that the chase continued for another "three to four minutes" between the collision and the time when he took the suspect into custody, and the entire chase lasted "approximately six, seven minutes."

Martinez sued Harris County for negligence, alleging that she and her two children were injured when Johnson's patrol cruiser struck her car. The county generally denied Martinez's allegations and asserted governmental immunity.

Harris County moved for summary judgment on its immunity defense. The county argued that the doctrine of official immunity shielded Johnson from personal liability, and that it therefore retained its governmental immunity from suit. Martinez responded that the county had not proven conclusively Johnson's good faith, a prerequisite to official immunity.

Disregarding materials the trial court struck from the record, the summary-judgment proof consisted of:

- an affidavit and curriculum vitae of the county's expert, former Chief of Police of San Antonio, Albert Ortiz;

- a transcript of Johnson's deposition;

- a letter summarizing the Internal Affairs Division's investigation of Johnson's accident;
- an accident report; and
- an interdepartmental statement written by Johnson regarding his pursuit of the suspect and the accident.

The last four items were introduced into the record by Martinez without objection.

The trial court granted summary judgment in favor of the county and ordered that Martinez take nothing. This appeal followed.

## Analysis

### I. Official immunity and good faith

Martinez contends that the trial court erred by granting summary judgment. She argues that Ortiz's affidavit was the only competent summary-judgment proof and that it did not establish conclusively Johnson's good faith, which is an essential element of official immunity. Harris County responds that the summary-judgment record also included a transcript of Johnson's deposition and his interdepartmental statement and that the summary-judgment record as a whole conclusively established the deputy's good faith.

We review the trial court's grant of summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex. 2004). We assume that all evidence favorable to the nonmovant is true. TEX. R. CIV. P. 166a(c); *Junemann v. Harris Cty.*, 84 S.W.3d 689, 692 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). We also indulge every reasonable inference and resolve any reasonable doubt in favor of the nonmovant. *Junemann*, 84 S.W.3d at 692.

Counties generally enjoy governmental immunity from suit, which deprives courts of subject-matter jurisdiction to hear claims against them. *Escobar v. Harris Cty.*, 442 S.W.3d 621, 627 (Tex. App.—

Houston [1st Dist.] 2014, no pet.). However, the Legislature has waived governmental immunity with respect to suits alleging property damage or personal injury caused by a wrongful act or omission or negligence of a county employee using a motor-driven vehicle in the scope of his employment, so long as the employee would be liable personally. TEX. CIV. PRAC. & REM. CODE § 101.021(1). This personal-liability requirement narrows the scope of the waiver by ensuring that when a county employee is immune from suit, such as when the doctrine of official immunity applies, the county likewise remains immune from suit. *Univ. of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000); *Williams v. City of Baytown*, 467 S.W.3d 566, 572–73 (Tex. App.—Houston [1st Dist.] 2015, no pet.).

The doctrine of official immunity protects government employees from civil liability for conduct that otherwise would be actionable. *Ramos v. Tex. Dep't of Pub. Safety*, 35 S.W.3d 723, 726 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). It is an affirmative defense that applies when government employees discharge discretionary duties in good faith and act within the course and scope of their authority. *Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 642–43 (Tex. 2015) (per curiam); *Wadewitz v. Montgomery*, 951 S.W.2d 464, 465–66 (Tex. 1997). A government employee may obtain summary judgment based on the doctrine of official immunity by conclusively establishing three elements as a matter of law: discharge of a discretionary duty, good faith, and course and scope of authority. *Junemann*, 84 S.W.3d at 692–93; *Ramos*, 35 S.W.3d at 726–27.

On appeal, Martinez does not dispute that Johnson was acting within the scope of his authority as a deputy or that his

decisions regarding the pursuit were discretionary. Thus, because official immunity is an affirmative defense and the defendant has the burden to prove good faith, the dispositive issue is whether Johnson conclusively established that he acted in good faith. *Ramos*, 35 S.W.3d at 727.

■ Good faith is measured against a standard of objective reasonableness. *Bonilla*, 481 S.W.3d at 643; *Wadewitz*, 951 S.W.2d at 466. Under this objective standard, the government employee's subjective state of mind or motive is irrelevant. *Bonilla*, 481 S.W.3d at 643–44; *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426–27 (Tex. 2004). The test of good faith is whether a reasonably prudent government employee operating in like circumstances could have believed that the need for the officer's actions outweighed a clear risk of harm to the public from those actions. *Bonilla*, 481 S.W.3d at 643.

■ The Supreme Court of Texas has identified factors that courts should consider when assessing a law-enforcement officer's good faith in the context of police-pursuit cases. *See Clark*, 38 S.W.3d at 580–83. In analyzing law enforcement's need to intervene, we consider the seriousness of the crime to which the officer responded, whether the officer's immediate presence was necessary to prevent injury or loss of life or to apprehend a suspect, and any alternative courses of action that may have been available to achieve a comparable result. *Id.* at 581; *Wadewitz*, 951 S.W.2d at 467. Against these considerations we balance the risks the pursuit entailed, the likelihood that these risks could have been realized, and whether these risks would be clear to a reasonably prudent officer. *Clark*, 38 S.W.3d at 581–82; *Junemann*, 84 S.W.3d at 694. However, we bear in mind that the circumstances may prevent an officer from being able to analyze thoroughly each factor affecting the needs and

risks associated with a pursuit and that this inability does not preclude good faith. *Clark*, 38 S.W.3d at 583. Good faith does not require consideration of risks that did not exist in a particular case. *Id.* at 586. An assessment of road, weather, and traffic conditions may suffice if the record does not indicate that other circumstances affected the risks. *Id.*; *Harris Cty. v. Smyly*, 130 S.W.3d 330, 335 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

■ This inquiry does not concern carelessness or negligence, *Ballantyne*, 144 S.W.3d at 426, and evidence of negligence does not negate good faith. *Telthorster*, 92 S.W.3d at 467. The question is not what a reasonable person would have done, but rather what a reasonable person could have believed. *Ballantyne*, 144 S.W.3d at 426. In assessing what a reasonable person could have believed under the circumstances, we consider only the information that the officer had at his disposal when he made his decisions, not facts that subsequently became known to him. *Telthorster*, 92 S.W.3d at 465; *Tex. Dep't of Pub. Safety v. Rodriguez*, 344 S.W.3d 483, 491 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *Adams v. Downey*, 124 S.W.3d 769, 772 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In this regard, the good-faith standard is akin to the standard of review for abuse of discretion; only those who are plainly incompetent or knowingly violate the law lack the good faith necessary to be shielded by official immunity. *Bonilla*, 481 S.W.3d at 643; *City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007) (per curiam). When the record contains competent proof of good faith and the other elements of official immunity, the burden shifts to the plaintiff to introduce controverting proof that no reasonable person in the officer's position could have thought the circumstances justified his ac-

tions. *Clark*, 38 S.W.3d at 581; *Adams*, 124 S.W.3d at 772.

In support of Johnson's good faith, Harris County submitted the affidavit of Albert Ortiz, the former chief of police of San Antonio. Ortiz noted that Johnson observed a car whose driver was fleeing from a motorcycle officer, and "would not stop." He stated that a law-enforcement officer riding a motorcycle "is much more vulnerable than an officer driving a patrol car." "If the motorcycle officer loses control of his motorcycle and crashes, or has an accident with another vehicle, he or she is much more likely to be injured than an officer in a car." Accordingly, he opined that "a reasonably prudent deputy, under the same or similar circumstances as faced by Deputy Johnson, could have believed that the need to take over the pursuit" from the motorcycle officer "outweighed any risk of harm to the public in taking this action."

Beyond the need for Johnson's initial engagement in the ongoing pursuit, Ortiz also described facts that developed during the course of the pursuit. He noted that Johnson's "Incident Report" said that the fleeing driver "was consistently ignoring traffic control devices and stop signs" and that he "was traveling through intersections with no regard for other vehicles or pedestrians and at times traveling 60–70 mph." Ortiz opined that "[f]ailure to stop when being pursued by a law-enforcement officer and traveling through intersections while disregarding traffic signals at a high rate of speed are serious crimes."

Ortiz acknowledged that any pursuit of a fleeing driver entails risks to other drivers on the road. But statements by Johnson indicated "he was aware of the risks involved" in pursuing the fleeing driver. As evidence of this, Ortiz referenced "page 2 of the Inter-Departmental Correspondence dated April 24, 2014." In that document, Johnson stated:

I weighted [*sic*] the dangerous circumstances that [the motorcycle officer] was engaged in and being within my jurisdiction, I immediately assisted....

The suspect's vehicle turned right at the 7000 block of the Gulf Freeway traveling southeast along the service road at a high rate of speed. The suspect's vehicle then continued in a south-southeast direction onto Evergreen Drive entering into a residential area....

I pursued the suspect's vehicle giving particularly high caution to other vehicles and pedestrians while traveling through this residential area. I began to give the dispatcher a description of the suspect's vehicle and its occupants....

The suspect's vehicle continued to travel westbound onto Fairway Drive and then made a right onto Telephone Road leaving the residential area.

I would like to add that I relied heavily on my training from the police academy in vehicle pursuits and my years of experience as a certified Police Officer engaged in multiple pursuits to analyze the threat and attempted to clear every intersection as we passed through. I continuously weighed all the variables behind the pursuit that I had at my disposal at that time.

While northbound at the 4700 block of Telephone Road I noticed that the suspect's vehicle and I were approaching the intersection of Golfway Street/Woodridge Drive under an illuminated red traffic stoplight. (Golfway Street is west of Telephone Road and Woodridge Drive is east of Telephone Road.) Slowing my speed, I proceeded into the intersection turning onto Woodridge Drive with every degree of caution available. Using precaution I continued to lower my speed and position my patrol vehicle be-

hind and slightly to the left of the suspect's vehicle. While in this position it afforded me a clear view of Golfway Street motorists and giving the motorists a clear view of me. I switched [the] audible sound setting on my siren back and forth to get the attention of other motorist[s] to alert them of the pursuit.

In addition to Johnson's own statement describing the risks and his efforts to mitigate them, Ortiz's affidavit observed that "the weather and road conditions were reportedly good."

With specific reference to the conclusion of the vehicular pursuit, Ortiz's affidavit noted that in reaction to the fleeing driver's unanticipated "sharp right turn onto Woodridge Road," Johnson "lowered his speed and positioned his vehicle to the left of the suspect's vehicle when he followed him." Ortiz stated that if Johnson had not decided to continue his pursuit through the turn, it would have increased the chances that the fleeing driver would not have been apprehended. Ortiz opined that "a reasonably prudent officer could have believed that the need to make this turn outweighed the risk of harm that an accident would occur, and also the risk that [the fleeing driver] would have escaped." His overarching opinions were that "Deputy Johnson, in the course and scope of his employment with Harris County, exercised good faith when he pursued the vehicle that was fleeing," and that "a reasonably prudent law enforcement officer, under the same or similar circumstances as faced by Deputy Johnson, could have believed that the need to pursue the fleeing vehicle in the manner that Deputy Johnson did outweighed the risk of harm to the public resulting from that course of action."

▮ Martinez contends that Ortiz's affidavit is inadequate in several respects and that she therefore did not bear the burden of controverting Johnson's good

faith. First, she argues that the summary-judgment evidence of good faith was limited to Ortiz's affidavit, which was too conclusory to qualify as proof. But Martinez herself introduced Johnson's deposition transcript and interdepartmental statement into the record. Accordingly, the summary-judgment record was not as spare as Martinez contends, and the trial court was entitled to rely on the evidence introduced by both Harris County and Martinez in making its ruling. *See* TEX. R. CIV. P. 166a(c); *Wilson v. Burford*, 904 S.W.2d 628, 629 (Tex. 1995) (per curiam); *Warnke v. Nabors Drilling USA*, 358 S.W.3d 338, 345 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Nor was Ortiz's affidavit conclusory. Expert testimony is conclusory if it "lacks objective, evidence-based support for its conclusions." *See Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010) (per curiam). While Ortiz's affidavit was concise, he supported his conclusions with specific facts, and these facts were substantiated by information referenced by and attached to the affidavit.

Second, Martinez contends that Ortiz failed to address adequately those factors relevant to weighing the need for pursuit against its risk. She concedes that the fleeing driver "posed a risk of harm to the general public," but she argues that this could not justify Johnson's decision to pursue. According to her, "the reckless behavior on the part of the suspect was created by Deputy Johnson's decision to pursue the suspect and the suspect presumably would have returned to normal driving practices, thereby eliminating any risk of harm to Martinez or other innocent parties on the roadway, if the chase had been halted."

We are unpersuaded by this argument, which is speculative and contrary to the evidence. It is undisputed that when John-

son encountered the suspect, he already was evading apprehension. The choice Johnson faced was whether to join a pursuit already in progress. Therefore, Johnson's decision to do so did not cause the suspect's flight. There is no evidence in the record regarding how the suspect might have reacted had Johnson decided not to join the pursuit. While a consequence of discontinuing the pursuit could have been that the fleeing driver would successfully evade detention and then resume "normal driving," we cannot presume that instantly would eliminate the risk of harm. It is at least equally likely that the suspect would continue his flight until he was confident in the success of his escape. The record reveals no new risk factor that decisively shifted the balance of factors against pursuit.

Martinez rejoins that if law-enforcement officers are allowed to justify the need for pursuit by a fleeing suspect's dangerous driving, all high-speed pursuits would be justifiable without regard to the test for good faith because "every high speed chase will, by its very nature, result in a fleeing suspect who drives dangerously." This argument, however, mischaracterizes the county's position. Its expert did not base his opinion about the need for pursuit solely on the danger that the fleeing driver posed to the general public. Ortiz identified other considerations relevant to his conclusion that a reasonably prudent officer in Johnson's situation could have decided to join the pursuit, particularly the motorcycle officer's apparent judgment that pursuit was necessary and that officer's relative vulnerability. Moreover, the Supreme Court has credited affidavits that emphasized or relied in part on the need for pursuit based on the danger that a fleeing driver posed to the general public. *See Bonilla*, 481 S.W.3d at 645; *Clark*, 38 S.W.3d at 585–87. Accordingly, Ortiz was entitled to take this danger into account,

though it was not the sole or even the decisive factor supporting his opinion about what a reasonably prudent law-enforcement officer could have believed under the same or similar circumstances.

Third, Martinez contends that the reasonableness of Johnson's decision to join the pursuit—and the adequacy of Ortiz's opinion on this subject—should be assessed based on facts unknown to Johnson when he made the decision to do so. For example, she argues that Johnson knew nothing about the fleeing driver or why the motorcycle officer had decided to stop the driver. Martinez likewise contends that it is significant that Johnson did not know that the motorcycle officer had decided to end the pursuit moments before Johnson joined it. She also posits that Johnson could not evaluate properly whether he needed to join or continue the pursuit due to his ignorance regarding the location of other deputies. However, law-enforcement officers frequently must make quick decisions based on limited information. *See Clark*, 38 S.W.3d at 583. Confronted with a high-speed chase involving a more vulnerable motorcycle officer, Johnson made the decision to join the pursuit within a few seconds, and his decision to do so was consistent with his employer's policy.

The fleeing driver's decision to turn onto Woodridge Drive from Telephone Road similarly required Johnson to decide quickly whether to follow or discontinue the pursuit. The test for good faith takes into account the exigencies of law enforcement by examining whether a reasonably prudent officer acting in like circumstances could have believed that his conduct was justified given what the officer knew when he acted. *See Telthorster*, 92 S.W.3d at 465; *Adams*, 124 S.W.3d at 772. Under the proper legal standard, facts outside of the officer's knowledge are not

relevant to an evaluation of his good faith.[2] *Telthorster*, 92 S.W.3d at 465; *Adams*, 124 S.W.3d at 772. The standard does not penalize an officer for the inability to recognize or evaluate a risk due to circumstances beyond his control, like the need to make a split-second decision. *Clark*, 38 S.W.3d at 583. The doctrine of official immunity exists to safeguard public officials from the very sort of second-guessing grounded in hindsight that Martinez advocates. *See Telthorster*, 92 S.W.3d at 463.

Fourth, Martinez contends that Ortiz did not address adequately possible alternative courses of action that Johnson could have taken. According to her, Ortiz falsely suggested that Johnson had only two choices: join and continue the chase to apprehend the fleeing driver or permit the driver to escape and go unpunished. Martinez suggests that because Johnson had notified dispatch of the fleeing driver's paper license-plate number, he could have ended the pursuit and permitted law-enforcement officers to try to apprehend the driver later at his residence. However, Ortiz did note the general possibility of trying to apprehend the suspect at a later time, and he discounted it given the suspect's dangerous driving. Moreover, as Martinez acknowledges, her argument is speculative. While Johnson had notified dispatch of the fleeing driver's temporary plate number, dispatch did not provide him with any information during the pursuit about the vehicle, its ownership, or whether it was stolen. The fleeing Dodge Caliber had at least two occupants. Johnson did not know the identity of the driver or passenger during the pursuit, nor did he know whether either had been identified based on the plate number or other information that he provided to dispatch. Given the limited state of his knowledge, Johnson could not evaluate the likelihood that the fleeing driver could have been apprehended later had the pursuit been discontinued.

■ Under these circumstances, Ortiz was not obliged to consider a purely hypothetical alternative that Johnson could not have assessed given the limited facts known to him. An officer may not be able to thoroughly analyze every need or risk factor in a given case. *See Clark*, 38 S.W.3d 583. In these situations, an expert need not negate an alternative that did not arise or become apparent during the actual pursuit. *See id.* at 586.

Finally, Martinez contends that Ortiz's affidavit lacked the factual detail necessary to analyze the risks posed by the pursuit and that the absence of these details precluded a showing that a reasonably prudent officer could have believed the need to pursue the fleeing driver outweighed those risks. For example, she asserts that Ortiz did not discuss road, traffic, or weather conditions or whether the neighborhood was commercial or residential. She also faults Ortiz's affidavit for failing to address the two obstructions that prevented Johnson from seeing her car.

The record reveals that Ortiz did consider and rely upon the kinds of factual details that Martinez contends are lacking from his affidavit. In his affidavit, which was admitted into evidence, Ortiz disclosed the materials he relied upon in preparing his affidavit. Those materials included the Harris County Precinct 6 Constable's Of-

---

2. In violation of this principle, from the first paragraph of its background section the dissent emphasizes information that was unknown to Johnson, such as the fact that the motorcycle officer originally was motivated to stop the suspect because he had an outstanding warrant for his arrest for a Class C misdemeanor traffic offense. Emphasizing such information second-guesses split-second law-enforcement decisions, and it is inconsistent with the well-settled law applicable to this appeal.

fice Internal Affairs Investigation file, which was attached in its entirety to the affidavit, but Martinez successfully objected to the file being admitted into evidence. Nevertheless, the affidavit setting forth Ortiz's opinion was admitted, consistent with the rules of evidence. An expert may base an opinion on facts or data in the case that the expert has reviewed, if experts in the particular field reasonably would rely on those kinds of facts in forming an opinion on the subject, and they need not be admissible for the opinion to be admitted. TEX. R. EVID. 703.

 While good faith may be proved by expert opinion, an officer's sworn testimony may do so too. *Gidvani v. Aldrich*, 99 S.W.3d 760, 764 (Tex. App.— Houston [1st Dist.] 2003, no pet.). Courts must consider all of the competent summary-judgment proof in the record in deciding whether good faith is shown. *See Bonilla*, 481 S.W.3d at 643; *Telthorster*, 92 S.W.3d at 465. Johnson's deposition testimony is part of that record, and he said that it was "dry and sunny" and that the weather was not a factor in the pursuit or accident. He testified that it was shortly after 5:00 pm on a weekday and traffic was "light to moderate." He discussed the route of pursuit, including that it went through a residential neighborhood before leading into an area of "local businesses" where the accident occurred. Johnson also explained how the position of the suspect's car relative to his cruiser and a one-foot dip in the road obscured the presence of Martinez's car at the intersection, and he discussed his failure to appreciate these two visual obstructions when he decided to follow the fleeing driver into the turn and continue the pursuit. Thus, the record contains the factual details that Martinez contends are lacking.

On the record before us, which includes not only Ortiz's affidavit but also Johnson's deposition transcript and his interdepartmental statement about the pursuit and accident, we conclude that there is competent evidence that a reasonably prudent law-enforcement officer could have believed that the need to halt and apprehend the fleeing driver outweighed the risks of pursuit. Evidence concerning good faith must address what a reasonable officer could have believed under the circumstances and must be substantiated with facts showing that the officer in question considered both the need to pursue and apprehend the suspect and the risk of harm to the public. *Clark*, 38 S.W.3d at 581. Ortiz's affidavit and Johnson's statement and sworn testimony addressed the facts and the factors pertaining to the need for pursuit and the risks and countervailing public safety concerns that were relevant in the particular circumstances of this case. *See Clark*, 38 S.W.3d at 581–83; *Wadewitz*, 951 S.W.2d at 467. Together they conclusively established that a reasonable officer, under the same or similar circumstances, could have balanced need and risk as Johnson did, and thus the record contains competent proof of his good faith. *See Clark*, 38 S.W.3d at 581–83.

The evidence relating to the balancing of need and risk was not limited to Johnson's initial decision to take over the pursuit, but it also specifically addressed the continuing developments through the conclusion of the chase. After joining the pursuit, Johnson observed the fleeing suspect "consistently ignoring traffic control devices and stop signs" and "traveling through intersections while disregarding traffic signals," which are "serious crimes." Ortiz noted cautionary actions taken by Johnson over the course of the chase to mitigate risks, including using the cruiser's emergency lights and decelerating in the turn when the accident occurred. Johnson himself emphasized his care in attempting "to

clear every intersection" and using his siren to alert other motorists. By contrast, Martinez did not introduce any proof that no reasonable officer could have decided to join the pursuit of the fleeing driver, or that no reasonable officer could have continued to pursue him throughout the duration of the chase.

Our dissenting colleague concedes that Johnson's original action to join the pursuit was justified, but contends that he nevertheless was required immediately to abandon the pursuit based on a supposed lack of information sufficient to justify continuing the pursuit. Significantly, the dissent fails to identify any particular point in time at which no reasonable officer could have believed that continuation of the pursuit was justified. Rather, the dissent views the facts in a light more critical of the officer's actions than the record can support.[3] The dissent asserts that because "the risk continued to rise during the pursuit," its unexplained yet "inevitable" conclusion is that the county failed to make a prima facie showing of Johnson's good faith. As previously noted, the Supreme Court has instructed that while circumstances may prevent an officer from thoroughly analyzing each factor affecting the needs and risks associated with a pursuit, the officer is not penalized for that reason, and such exigencies are consistent with a showing of good faith. *Clark*, 38 S.W.3d at 583.

▇▇▇ While professing not to suggest "what the law should be," the dissent opines that "it does not seem unreasonable to place an expectation on a governmental entity seeking to apply immunity to exercise best efforts to communicate with the other law-enforcement agency to determine why the pursuit began and then communicate that information to the officer engaged in the pursuit." Dissent at 577. This policy proposal reflects our colleague's apparent dissatisfaction that there is no evidence "of what *actions Harris County took* to learn about the fleeing car, its possible driver, how or why the pursuit began, or any other information to supply the need for the pursuit." Dissent at 577 (emphasis supplied). This reflects a grave misunderstanding of the legal context of the dispute, as well as the proper role of a court in deciding the particular dispute presented to us. The ultimate wisdom of Harris County's policies, or their adequacy to guide officers in circumstances such as the facts of this case, are not relevant to our analysis. The applicability of the waiver of the county's sovereign immunity turns on the applicability of *the law-enforcement officer's official immunity.* The focus must be, and must remain, on the good faith of *the officer's actions* in the circumstances presented to him, not on some post-hoc pontification about what the county could have done better to assist the officer. So whatever merit there might be in the dissent's critique and post-accident proposal to improve the cross-departmental management of an ongoing police pursuit, it has nothing to do with the legal question presented by this appeal. Such considerations are entirely irrelevant to the officer's good faith, which is the only disputed element of his official immunity in this case. If official immunity applies, governmental immunity applies as well, *Clark*, 38 S.W.3d at 580, and it is not within the

---

**3.** For example, it is inaccurate and unfair to Johnson to say, as the dissent does, that "he had *no idea* why he was pursuing the fleeing vehicle other than the fact that the vehicle had been fleeing another officer." Dissent at 576 (emphasis supplied). A more objective evaluation of the record would incorporate factors such as the law-enforcement objectives of stopping both the suspect and the risk to the public caused by the suspect's dangerous flight.

purview of our appellate review of the officer's good faith to substitute our views for that of the Legislature concerning the scope of the waiver of immunity granted by the Tort Claims Act, see TEX. CIV. PRAC. & REM. CODE § 101.021(1), or for that of the county about whether or how to implement infrastructure to facilitate cross-jurisdictional communications among law enforcement officers.[4]

The inadequacy of the dissent's rationale is exemplified by its assertion that the operative facts of this case "will always be present in a high-speed police chase" such that the implication of our holding is that "every high-speed pursuit will be justified." Wrong. The circumstances of every high-speed police chase are different, and the balancing of need and risk factors will vary from case to case. Not every police chase is as short as this one was. Not every police chase involves uncontroverted evidence that the pursuing officer took care to "clear every intersection" in the course of following a suspect through a residential neighborhood. And not every officer in a high-speed chase operates under the informational constraints of not knowing why the chase was initiated, not knowing the identity of the fleeing suspect, and not having the ability to get that information in time to inform a continuing balancing of need and risk. The dissent's suggestion that our reasoning would subsume "virtually every—if not every—high speed police pursuit" is baseless hyperbole.

The dissent is likewise misguided in its suggestion that we treat Johnson's "lack of knowledge as proof of the need" for the pursuit. The dissent concedes that initially joining the pursuit was justified. This logically entails a concession that initially engaging in the pursuit was justified. Thus, while the changing circumstances of a police chase require a continuing assessment of need and risk, see Clark, 38 S.W.3d at 582–83, under the facts of this particular case, essentially the same considerations that justified the short pursuit at its beginning continued to justify the pursuit at its conclusion. To the extent circumstances changed, the record reflects Johnson's good-faith continuing evaluation of the need and risk. The burden thus shifted to Martinez to introduce controverting proof that, because of some development over the course of the pursuit, no reasonable person in the officer's position could have thought the circumstances justified a continuation of the pursuit. Clark, 38 S.W.3d at 581; Adams, 124 S.W.3d at 772. By the dissent's logic, Johnson was justified to begin his pursuit, but he immediately lost his justification and acted without good faith because of the incomplete information available to him under the circumstances. The dissent provides no cogent analysis or explanation to justify why the initial pursuit was justified, but lost its justification once Johnson encountered heavier traffic or when the fleeing driver briefly cut through a neighborhood.[5] The dissent fla-

---

4. *See also* TEX. CONST. art. 2 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.").

5. The dissent's suggestion that "it should be the County's burden to present some proof that discontinuing the chase would not affect the other driver's decision to flee," Dissent at 578, has no basis in law. The operative legal standard is whether a reasonably prudent officer operating in like circumstances could have believed that the need for the officer's actions outweighed a clear risk of harm to the public. It was no part of the county's burden to present "proof" about the outcome in a

grantly rejects the principles that facts outside of the officer's knowledge are not relevant to an evaluation of his good faith, and that we do not penalize an officer for the inability to recognize or evaluate a risk due to circumstances beyond his control. *See, e.g., Clark*, 38 S.W.3d at 583; *Telthorster*, 92 S.W.3d at 465. The dissent's refusal to acknowledge Johnson's good faith is tantamount to condemning him as plainly incompetent or knowingly violating the law. *See Bonilla*, 481 S.W.3d at 643. Nothing in the record of this case justifies such a conclusion.

We hold the record conclusively established that a reasonably prudent law-enforcement officer in Deputy Johnson's position could have believed that joining and continuing the pursuit of the fleeing driver was justified based on the facts known to him. The doctrine of official immunity therefore shields him from personal liability arising out of his accident with Martinez. His immunity, in turn, renders his employer, Harris County, immune as well.

**II. The emergency-response exception**

■ In the alternative, Martinez contends that summary judgment was improper because she pleaded an additional claim for conscious indifference and reckless conduct, which she maintains is subject to a separate statutory waiver of the county's governmental immunity. The statute on which she relies concerns emergency responses by government employees. *See* TEX. CIV. PRAC. & REM. CODE § 101.055(2). However, Section 101.055(2) does not waive the county's governmental immunity from suit; rather, that section is an exception to the Tort Claims Act's waiver of governmental immunity. *See City of San Antonio v. Hartman*, 201 S.W.3d 667, 671–72 (Tex. 2006); *Williams*, 467 S.W.3d at 572. Section 101.055(2) therefore does

not provide an alternative basis for waiver of the county's immunity.

**Conclusion**

We affirm the trial court's judgment in favor of Harris County.

Justice Higley, dissenting.

Laura Carter Higley, Justice, dissenting.

The Supreme Court of Texas has established guidelines to evaluate when a law enforcement officer engaged in a high-speed pursuit must call off the pursuit in the interest of public safety. *See, e.g., City of Lancaster v. Chambers*, 883 S.W.2d 650, 655–58 (Tex. 1994); *Wadewitz v. Montgomery*, 951 S.W.2d 464, 465–67 (Tex. 1997). The guidelines involve weighing the need to continue the pursuit against the risk to public safety. *See Chambers*, 883 S.W.2d at 656; *Wadewitz*, 951 S.W.2d at 466. Here, an officer had a justifiable need to take over a pursuit but had no knowledge from that point on with which to evaluate the need to continue the pursuit. Because I believe the majority incorrectly treats this lack of knowledge as proof of the need, I respectfully dissent.

**Background**

On Friday, January 17, 2014, Officer R. Martinez, with the Houston Police Department, was on motorcycle patrol in Houston, Texas. Around 5:00 p.m., he determined that the driver of a car in his vicinity had an outstanding warrant for his arrest for a Class C misdemeanor traffic offense. Officer Martinez attempted to stop the car, but the driver fled from him instead of stopping.

Deputy C. Johnson, with the Harris County Constable Precinct Six's Office,

hypothetical set of alternative circumstances

in which the officer made a different decision.

was also on patrol that day. He was stopped at an intersection when he saw Officer Martinez and the fleeing car pass through the intersection. Deputy Johnson later testified that both the Houston Police Department and the Harris County Constable's Office have policies establishing that, when an officer in a patrol car sees an officer on a motorcycle engaged in a high-speed pursuit, the officer in the patrol car is required to take over the pursuit. This is because an officer in a patrol car has a lower risk for injury in a high-speed pursuit than an officer on a motorcycle.

Based on the requirement to take over the pursuit, Deputy Johnson joined the pursuit. Officer R. Martinez fell back and briefly followed the pursuit at a slower speed. Deputy Johnson saw the license plate number of the fleeing car and reported it to his dispatch. The pursuit lasted six to seven minutes. During this time, he received no information about the vehicle, the possible driver, or the reason the pursuit began.

When the pursuit began, traffic was "light to moderate." During the pursuit, however, they travelled through some high traffic areas. The fleeing car forced several vehicles off of the road during the pursuit and drove through several intersections at a high rate of speed. At one point, the fleeing car was travelling between 60 and 70 miles per hour.

The fleeing car took many turns, including through residential neighborhoods. Towards the end of the pursuit, both cars were travelling northbound on Telephone Road, approaching the intersection of Woodridge Drive.[1] There were two northbound lanes on Telephone road. The fleeing car was in the right lane, and Deputy Johnson was in the left lane. The light at

the intersection of Woodridge Drive was red for them.

At the intersection, the fleeing car turned right onto Woodridge Drive. Deputy Johnson continued the pursuit, turning right from the left lane. He positioned his patrol car slightly to the left of the fleeing car. At the end of the turn, he faced the left turn lane for opposing traffic.

At the time, Jaclynn Martinez was in the left turn lane. An eighteen-wheeler cab was behind her. The front left side of Deputy Johnson's patrol car collided with the front left side of Martinez's car. The force of the impact pushed Martinez into the eighteen-wheeler cab behind her.

Deputy Johnson came to a stop as a result of the accident. He then left the scene, continuing the pursuit. Shortly after, the fleeing car collided with other cars, and the pursuit ended.

A few months after the accident, Deputy Johnson submitted, upon request, a statement of the events surrounding the accident. In it, Deputy Johnson stated,

> While northbound at the 4700 block of Telephone Road[,] I noticed that the suspect's vehicle and I were approaching the intersection of Golfway Street/Woodridge Drive under an illuminated red traffic stoplight. (Golfway Street is west of Telephone Road and Woodridge Drive is east of Telephone Road.) Slowing my speed, I proceeded into the intersection turning into Woodridge Drive with every degree of caution available. Using precaution[,] I continued to lower my speed and position my patrol vehicle behind and slightly to the left of the suspect's vehicle. While in this position[,] it afforded me a clear view of Golfway Street

1. More specifically, Woodridge Drive runs east of Telephone Road and Golfway Street runs west of Telephone Road.

motorists and giving the motorists a clear view of me. I switched audible sound setting on my siren back and forth to get the attention of other motorists to alert them of the pursuit.

As I continued to negotiate my turn off of Telephone Road onto Woodridge Drive[,] I observed the suspect's vehicle was starting to come out of the turn. The suspect's vehicle started to accelerate as it was coming out of the turn onto Woodridge Drive and started to open the distance between our vehicles. It was at this time I first observed a Green Kia Soul [Martinez's car] stopped in front of the 18 Wheeler Tractor in the left hand turn lane of Woodridge Drive. The Kia Soul had been hidden from [m]y view by the suspect's vehicle.

After suit was filed, Martinez took Deputy Johnson's deposition. During the deposition, Deputy Johnson discussed the need to "clear" an intersection when passing through it during a high-speed pursuit. He explained that clearing an intersection meant determining the traffic flow at the intersection, making sure there were no obstructions blocking his view, and making sure it is safe to proceed through the intersection.

Deputy Johnson also discussed factors that should be weighed in deciding whether to pursue a vehicle. He acknowledged that time of day is one factor, identifying the time during rush hour traffic as a riskier time to engage in a high-speed pursuit. He also testified that he was familiar with the Telephone Road and Woodridge Drive intersection and that he had

traveled through it many times. He stated that there is a one-foot decline onto Woodridge Drive from Telephone Road. He knew about the decline and knew that it could be an obstruction.

Towards the end of the deposition, Deputy Johnson discussed the police chase and subsequent collision. He testified that, when they approached Telephone Road, he was one car-length behind the fleeing car. The light was red. There were two northbound lanes. The fleeing car was in the right lane, and Deputy Johnson was in the left lane. The fleeing car appeared to be going straight through the red light but then turned right onto Woodridge Road. Deputy Johnson turned in response.

Deputy Johnson testified that Martinez was at a complete stop at the intersection to turn left. Her left-turn light was red as well. There was an eighteen-wheeler cab behind her and three or four cars behind the cab. As Deputy Johnson made the turn, he saw the eighteen-wheeler cab but did not see Martinez in front of the cab. He testified that the first time he saw her was when he came into contact with her.

He testified that two obstructions prevented him from seeing Martinez. The one-foot decline onto Woodridge Drive from Telephone Road was one obstruction blocking his view. The fleeing car was the other obstruction. Deputy Johnson insisted that he cleared the intersection because he looked into the space where Martinez was stopped "and there wasn't anything there." He also acknowledged that, at the time, Martinez was, in fact, there.[2]

2. Q. So you tried to clear the intersection, but you knew you had an obstructed view, right?
 A. No. I cleared the intersection.
 Q. Well, not really because Ms. Martinez was there.
 A. After the fact.
 ....

Q. ... Well, she didn't drive up after the fact. She was there the whole time, right?
A. Correct.
Q. You just didn't see her.
A. Correct.
....
Q. Well, I'm confused. Why didn't you see Ms. Martinez?

· The County later filed a motion for summary judgment. In it, the County argued that governmental immunity prevented Martinez's suit against it. The County's evidence included the affidavit of Albert Ortiz. In his affidavit, Ortiz averred that he had been a police officer in San Antonio for 33.5 years and that he was the former chief of police there. In the affidavit, Ortiz identified the need for Deputy Johnson to pursue the fleeing car was because the original officer in pursuit was on a motorcycle and pursuit on a motorcycle is inherently more dangerous. He also identified the dangerous situation created by the fleeing car driving so fast as a need to continue the high-speed pursuit. He asserted the risks were minimized because the weather and road conditions were good and Deputy Johnson had his lights and sirens operating.

Martinez also filed an amended petition and a response to the County's motion for summary judgment. The trial court granted the County's motion, dismissing in full Martinez's claims against the County.

### Motion for Summary Judgment

In four issues on appeal, Martinez argues that the trial court erred by granting summary judgment. In one of its cross-issues, the County argues that the evidence shows it is exempt under section 101.055 of the Texas Tort Claims Act from the waiver of governmental immunity.

### A. Standard of Review

Courts review a motion for summary judgment de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). The County sought summary judgment on the basis of governmental immunity. If immunity applies, the trial court lacks subject-matter

jurisdiction over the case. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004); *see also Fink v. Anderson*, 477 S.W.3d 460, 465 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Subject-matter jurisdiction is a question of law, which courts review de novo. *Miranda*, 133 S.W.3d at 226.

Courts take as true all evidence favorable to the nonmovant and indulge reasonable inferences and resolve doubts in her favor. *Id.* at 228. When the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the jurisdictional issue as a matter of law. *Id.* If, however, the evidence creates a fact question regarding jurisdiction, then the trial court must deny the motion, and the fact issue will be resolved by the factfinder. *Id.* at 227–28.

### B. Good Faith

As the majority correctly states, whether the County is immune from suit turns on whether Deputy Johnson was entitled to official immunity. *See DeWitt v. Harris Cnty.*, 904 S.W.2d 650, 653 (Tex. 1995). Official immunity is an affirmative defense. *Wadewitz*, 951 S.W.2d at 465; *Chambers*, 883 S.W.2d at 653. Accordingly, the County bore the burden of establishing its application. *See Chambers*, 883 S.W.2d at 653.

"A governmental employee is entitled to official immunity: (1) for the performance of discretionary duties; (2) within the scope of the employee's authority; (3) provided the employee acts in good faith." *Univ. of Hous. v. Clark*, 38 S.W.3d 578, 579 (Tex. 2000). There is no dispute that Deputy Johnson was performing discretionary duties at the time of the collision or that he was acting within the scope of his authority as a deputy. The only dispute, then, is

A. Because of the two obstructions, which

[were] the [fleeing] vehicle and the decline.

whether Deputy Johnson acted in good faith.

The Supreme Court of Texas has held that good faith is evaluated with a balancing test. *See Chambers*, 883 S.W.2d at 656. And it is that balancing test that controls the outcome of this case. This test weighs the need to immediately apprehend the suspect against the risk posed to the public by continuing the pursuit. *See id.*

On the need side of the ledger, courts consider "the urgency of the circumstances requiring police intervention." *Wadewitz*, 951 S.W.2d at 467. Courts evaluate the urgency of the circumstances by considering "factors such as the seriousness of the crime or accident to which the officer responds, whether the officer's immediate presence is necessary to prevent injury or loss of life or to apprehend a suspect, and what alternative courses of action, if any, are available to achieve a comparable result." *Id.*; *see also Clark*, 38 S.W.3d at 582 (holding *Wadewitz* factors apply to police pursuit cases).

On the risk side of the ledger, courts consider "the countervailing public safety concerns." *Wadewitz*, 951 S.W.2d at 467. The public safety concerns include consideration of "the nature and severity of harm that the officer's actions could cause (including injuries to bystanders . . .), the likelihood that any harm would occur, and whether any risk of harm would be clear to a reasonably prudent officer." *Id.* "[A]n officer in a police pursuit must assess both the risk that the suspect will injure a third party *and* the risk that *the officer himself* will injure a third party." *Clark*, 38 S.W.3d at 583 (emphasis in original).

A police pursuit usually entails rapidly changing circumstances. *See id.* at 582 (holding "both emergency responses and police pursuits may involve rapidly changing circumstances"). It follows, then, that determination of the reasonableness of a pursuit "require[s] a continuing assessment of need and risk." *Id.* at 582–83. Accordingly, proof that pursuit was reasonable at one point of chase does not establish that the entire pursuit was reasonable. *See id.*

A police officer acts in good faith during a high-speed pursuit if "a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Chambers*, 883 S.W.2d at 656. Because review is based on what a reasonably prudent officer *could* have believed, courts are not concerned with the individual officer's state of mind. *Wadewitz*, 951 S.W.2d at 466. Courts do, however, consider the information possessed by the officer in question at the time the incident occurred. *Chambers*, 883 S.W.2d at 656.

In determining whether official immunity applies, courts do not consider evidence concerning whether the officer in question was actually negligent. *City of Fort Worth v. Robinson*, 300 S.W.3d 892, 899–900 (Tex. App.—Fort Worth 2009, no pet.); *see also Harris Cty. v. Garza*, 971 S.W.2d 733, 735 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (holding determination of good faith renders finding of negligence immaterial); *Chambers*, 883 S.W.2d at 655 ("The complex policy judgment reflected by the doctrine of official immunity, if it is to mean anything, protects officers from suit even if they acted negligently."). *But see Junemann v. Harris Cty.*, 84 S.W.3d 689, 694 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (holding failure to take action may have some bearing on good faith).

If the County carries its burden of establishing that a reasonably prudent officer could have believed continued pursuit was necessary, the burden shifts to the

plaintiff on this point to "show that 'no reasonable person in the defendant's position could have thought the facts were such that they justified defendant's acts.'" *Chambers*, 883 S.W.2d at 657 (quoting *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993)). Compared to its federal counterpart, this test "is somewhat less likely to be resolved at the summary judgment stage." *Id.*

Expert testimony can be relevant to the determination of good faith. *Wadewitz*, 951 S.W.2d at 466. The testimony must be "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and [able to be] readily controverted." TEX. R. CIV. P. 166a(c). Conclusory statements "that a reasonable officer could or could not have taken some action will neither establish good faith at the summary judgment stage nor raise a fact issue to defeat summary judgment." *Wadewitz*, 951 S.W.2d at 466. Instead, the expert testimony "must address what a reasonable officer *could have believed* under the circumstances ... and must be substantiated with reference to each aspect of the [good faith] balancing test." *Id.* at 466–67.

Deputy Johnson testified in his deposition that he joined the pursuit because it was the constable's office's policy that, when an officer in a patrol car sees an officer on a motorcycle engaged in a high-speed pursuit, the officer in the patrol car is required to take over the pursuit. This is because an officer in a patrol car has a lower risk for injury in a high-speed pursuit than an officer on a motorcycle. When the pursuit began, traffic was "light to moderate." The weather was clear, and the pursuit quickly lead onto a highway frontage road. I would hold that, at the start of Deputy Johnson's pursuit, the need to join the pursuit outweighed the risk to public safety. *See Wadewitz*, 951 S.W.2d at 467.

Once Deputy Johnson joined the pursuit, however, he had no idea why he was pursuing the fleeing vehicle other than the fact that the vehicle had been fleeing another officer. *See Clark*, 38 S.W.3d at 582–83 (holding determination of reasonableness of pursuit "require[s] a continuing assessment of need and risk"). For the entire duration of his six to seven minute pursuit, Deputy Johnson had no information with which he could determine that the need to pursue the fleeing car outweighed the risk to public safety.

Compounding this problem is the fact that the evidence showed that the risk continued to rise during the pursuit. Although traffic at the start of the pursuit was light to moderate, Deputy Johnson testified that they travelled through some high traffic areas. This is during Friday rush hour traffic in Houston, Texas. The fleeing car forced several vehicles off of the road during the pursuit and drove through several intersections at a high rate of speed. At one point, the fleeing car reached speeds between 60 and 70 miles per hour. They travelled through major intersections and neighborhood streets.

As the risk increased, Deputy Johnson continued to have no knowledge of the need to continue the pursuit. The inevitable conclusion, then, is that the County failed to carry its burden of establishing that "a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to immediately apprehend the suspect outweighed a clear risk of harm to the public in continuing the pursuit." *Chambers*, 883 S.W.2d at 656. This is the critical inquiry. It is the only issue in dispute. Without any facts to establish a need to continue the pursuit, there is no basis to conclude that the County established as a matter of law that it was entitled to immunity. *See Wadewitz*, 951 S.W.2d at 467 ("Without taking both

sides of the *Chambers* good faith balancing test into account, neither Wadewitz nor his expert witness had a suitable basis for concluding that a reasonable officer in Wadewitz's position could or could not have believed that Wadewitz's actions were justified.").

The difficult situation in which Deputy Johnson was placed should not be diminished. Under employment policy, he was obligated to join the pursuit. The reasons for the policy are clear and reasonable. Yet, by following the policy, Deputy Johnson was placed in a situation where he could not adequately assess the need to continue the pursuit as conditions for risk changed. Moreover, the officer on the motorcycle was with the Houston Police Department, and there was no means of direct communication between the two.

Even so, under current law, there is no basis for holding that the County carried its burden as a matter of law. It is the obligation of this Court to apply the law. *Lubbock Cty., Tex. v. Trammel's Lubbock Bail Bonds*, 80 S.W.3d 580, 585 (Tex. 2002) ("It is not the function of a court of appeals to abrogate or modify established precedent. That function lies solely with this Court."). While it is beyond the scope of this dissent to determine what the law should be, *see id.*, it does not seem unreasonable to place an expectation on a governmental entity seeking to apply immunity to exercise best efforts to communicate with the other law enforcement agency to determine why the pursuit began and then communicate that information to the officer engaged in the pursuit.

Under the current record, there is no evidence of what actions Harris County took to learn about the fleeing car, its possible driver, how or why the pursuit

began, or any other information to supply the need for the pursuit. Nor is there evidence of why any of that information could not be obtained within the time before the accident occurred. Such matters could, in some cases, create fact issues as to the reasonableness of the efforts and time taken, which would preclude summary judgment. They would not, however, entirely preclude the application of immunity in situations like this.

Despite Deputy Johnson's admission that he did not know why he was pursuing the car, the majority holds that the evidence establishes that the County proved as a matter of law that a reasonably prudent officer could have believed that the need to apprehend the driver outweighed the risk to public safety posed by the pursuit. I cannot agree with the majority's reasoning.

To justify its holding that the County established as a matter of law that the need outweighed the risk, the majority relies on facts that will be true in virtually every—if not every—high speed police pursuit. For example, the majority relies on the facts that the fleeing car was travelling at high rates of speed, ignoring traffic and safety signs, and disregarding the safety of other vehicles or pedestrians. It is hard to conceive of a high-speed pursuit that does not match this description. Likewise, the majority points out that it is a crime to intentionally evade a police officer attempting to perform an arrest. The majority also considers the fact that Deputy Johnson indicated that he was aware of the risks involved as a basis for minimizing the risk posed by the pursuit. By relying on facts that will always be present in a high-speed police chase,[3] the majority effective-

---

**3.** The majority criticizes this statement by pointing out that not all police chases will have "the informational constraints of not

knowing why the chase was initiated." Of course, this is not a fact I have claimed to be true in virtually all police chases. It is other

ly neuters the balancing test created by the Supreme Court of Texas. Every high-speed pursuit will have the facts the majority relies on; so every high-speed pursuit will be justified.

Of particular concern is the majority's reliance on the fact that the fleeing driver was speeding and driving erratically as proof of an increased need, not an increased risk. The Supreme Court of Texas has done the opposite. For the need factor, courts are concerned with "the seriousness of the crime or accident to which the officer responds" before the high-speed pursuit begins.[4] *See Wadewitz*, 951 S.W.2d at 467. For the risk factor, "an officer in a police pursuit must assess both the risk that the suspect will injure a third party *and* the risk that *the officer himself* will injure a third party." *Clark*, 38 S.W.3d at 583 (emphasis in original).

I also note that the majority criticizes Martinez for being speculative about whether the fleeing driver would have returned to normal driving practices if Deputy Johnson has discontinued pursuit.[5] Of course it was the County's burden to establish as a matter of law that the need outweighed the risk. *See Chambers*, 883 S.W.2d at 653 (holding defendant bears burden of establishing affirmative defense of official immunity). Given the County's and the majority's reliance on the fact that the fleeing driver was fleeing as proof of the risk, it should be the County's burden to present some proof that discontinuing

the chase would not affect the other driver's decision to flee.

Finally, I am concerned by the following passage in the majority opinion:

> While Johnson had notified dispatch of the fleeing driver's plate number, dispatch did not provide him with any information during the pursuit about the vehicle, its ownership, or whether it was stolen. The fleeing Dodge Caliber had at least two occupants. Johnson did not know the identity of the driver or passenger during the pursuit, nor did he know whether either had been identified based on the plate number or other information that he provided to dispatch. *Given the limited state of his knowledge, Johnson could not evaluate the likelihood that the fleeing driver could have been apprehended later had the pursuit been discontinued.*

(Emphasis added.) Here, the majority explicitly acknowledges that Deputy Johnson could not properly evaluate the need to continue the chase. Yet, the majority somehow uses this very argument to bolster its conclusion that the County established as a matter of law that the need outweighed the risk. The majority is treating lack of knowledge of need as sufficient proof of the existence of the need and is criticizing Martinez for failing to prove what would have happened if Deputy Johnson had discontinued the chase. This is not the law. *See id.*; *Wadewitz*, 951 S.W.2d at 467 ("Without taking both sides

---

facts upon which the majority relies—such as speeding, ignoring traffic signs, and evading a police officer—that I have described as being true in virtually every police chase. Pointing to a fact that I have not described as being virtually always present does not disprove that the majority has relied on other facts that will virtually always be present.

**4.** Because it is not relevant to my analysis, I do not reach whether a police officer witnessing a driver traveling at a high rate of speed

or in a reckless manner before any police chase has begun can satisfy the need factor.

**5.** At the same time, the majority relies on Ortiz's assertion that Deputy Johnson failing to turn onto Woodridge Drive would have increased the chances that the fleeing vehicle would have had an accident with another vehicle. The majority does not explain how this is not speculative as well.

of the *Chambers* good faith balancing test into account, neither Wadewitz nor his expert witness had a suitable basis for concluding that a reasonable officer in Wadewitz's position could or could not have believed that Wadewitz's actions were justified.").

As the passage above highlights, the majority opinion discourages any investigation by the County into why the chase began or why it might need to continue and discourages any communication to the officer of any information that might allow him to better evaluate the need to continue the chase. If ignorance of the need satisfies the need element, then communication of pertinent information increases, not diminishes, the threat of liability to the officer as well as to the governmental entity. This is not a practice that should be encouraged.

## C. Recklessness

In its brief, the County argues that, even if this Court holds there is insufficient evidence of official immunity, the Court can still affirm the trial court's summary judgment against Martinez based on section 101.055 of the Tort Claims Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 101.055 (West 2011). Because it affirms based on the element of good faith, the majority does not reach whether the trial court's judgment could have been affirmed on this ground. *See City of San Antonio v. Hartman*, 201 S.W.3d 667, 671–72 (Tex. 2006) (holding section 101.055 is exception to waiver of governmental immunity); *Williams v. City of Baytown*, 467 S.W.3d 566, 579 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (holding that, because court had determined immunity had not been waived under section 101.021, court did not need to analyze arguments relevant to section 101.055.). I will touch on it briefly.

Section 101.055 provides, in pertinent part, that the Tort Claims Act (including its waiver of immunity) does not apply to a claim arising "from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action...." CIV. PRAC. & REM. § 101.055(2). The only dispute between the parties is whether Deputy Johnson was acting in compliance with the applicable laws and ordinances.

For the applicable law, section 546.001 of the Texas Transportation Code allows the driver of an authorized emergency vehicle to "exceed a maximum speed limit ... as long as the operator does not endanger life or property." TEX. TRANSP. CODE ANN. § 546.001(3) (West 2011). Even so, the driver of the emergency vehicle is not relieved from "(1) the duty to operate the vehicle with appropriate regard for the safety of all persons; or (2) the consequences of reckless disregard for the safety of others." TEX. TRANSP. CODE ANN. § 546.005(1)–(2) (West 2011). Under this section, while the duty exists to drive with appropriate regard for the safety of others, liability is only imposed in instances of reckless disregard for the safety of others. *City of Houston v. Davis*, No. 01-13-00600-CV, 2014 WL 1678907, at *6 (Tex. App.—Houston [1st Dist.] April 24, 2014, pet. denied) (mem. op.). "To establish recklessness in this context, the employee must have committed an act that he knew or should have known posed a high degree of risk of serious injury." *Id.* (citing *City of Pasadena v. Kuhn*, 260 S.W.3d 93, 99 (Tex. App.—Houston [1st Dist.] 2008, no pet.)).

The County argues three facts establish that Deputy Johnson was not driving recklessly: (1) Deputy Johnson had activated his emergency lights and siren; (2) he had slowed his speed before proceeding into

the intersection; and (3) "he 'cleared the intersection' to the best of his ability before he made the turn."

In *Kuhn*, the evidence indicated that, before entering an intersection with his lights and siren activated, the officer in question slowed his vehicle. 260 S.W.3d at 99–100. There was also evidence that a number of obstructions created a blind spot for possible intersecting traffic. *See id.* at 100. Nevertheless, the officer proceeded through and hit a vehicle that reached the intersection from the direction of the blind spot. *See id.* at 98. This Court held,

> Whether the intersection is blind does not create a material fact issue here in light of the undisputed testimony that [the officer] had on his emergency lights and siren and that he slowed before entering the intersection. Any intersection that an officer attempts to traverse when responding to an emergency is potentially a "blind intersection." That is why the statute provides that an emergency vehicle may proceed through a stop light after "slowing as necessary." *See* Tex. Transp. Code Ann. § 546.001(2). The undisputed evidence shows that [the officer] followed those procedures.

*Id.* at 100.

The differences between *Kuhn* and this case are controlling. First, failure to activate a patrol car's emergency lights and siren can raise a fact issue about whether the officer was driving recklessly. *Compare id.* (relying on use of lights and siren as proof to refute recklessness) *with Galveston Cty. Health Dist. v. Hanley*, No. 01-14-00166-CV, 2014 WL 6853608, at *5 (Tex. App.—Houston [1st Dist.] December 4, 2014, no pet.) (mem. op.) (holding facts suggesting officer did not use siren created fact issue for recklessness). Here, however, use of lights and a siren has little significance. Deputy Johnson acknowl-

edged that the purpose of lights and a siren is to alert other people to the presence of the patrol car and to indicate that other vehicles and people need to accommodate the officer's route of travel. But the record indicates that Martinez was aware of Deputy Johnson, was stopped at a light with other vehicles stopped behind her, would not have had reason to anticipate that Deputy Johnson would have turned into her lane, and did not have any reasonable opportunity to accommodate his turning into her lane once he did. The County provides no explanation of how Deputy Johnson's use of lights and a siren did have or could have had any effect on preventing the collision.

For his speed, Deputy Johnson testified that he slowed down before entering the intersection and turning. There is no evidence, however, of how fast he was travelling before the turn, how much he slowed down before or during the turn, or how fast he was travelling after slowing down. In fact, there is evidence in the record that Deputy Johnson maintained a one-car-length distance between himself and the fleeing car before entering the intersection, that Deputy Johnson was close enough to the fleeing car during the turn that the fleeing car obstructed his view of the traffic on the intersecting street, that Deputy Johnson thought the fleeing car was going to proceed straight through the intersection, and that he turned to follow the fleeing car. Viewed in the light most favorable to Martinez, this evidence suggests that Deputy Johnson did not slow before the turn to clear the intersection, but only slowed in the course of the turn. *See Miranda*, 133 S.W.3d at 226 (holding courts review motion for summary judgment in light most favorable to nonmovant).

Finally, in *Kuhn* this Court discounted the presence of the blind spot in the inter-

section that the other car passed through before entering the intersection. 260 S.W.3d at 100. Here, however, Deputy Johnson was driving *into* the blind spot. Deputy Johnson was aware of two obstructions that limited his view of the portion of road he was driving towards during rush hour traffic and continued the pursuit.

I would hold the County has not disproved recklessness as a matter of law. As a result, I would sustain Martinez's issue arguing that the trial court erred in granting summary judgment on her claims and overrule the County's cross-issue arguing that the evidence shows it is exempt under section 101.055 from the waiver of governmental immunity.

## Conclusion

I would reverse the trial court's grant of summary judgment on Martinez's claims and remand for further proceedings. Because the majority affirms, I respectfully dissent.