Opinion issued August 13, 2024



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00517-CV

_____

**HARRIS COUNTY, TEXAS, Appellant**

**V.**

**FLORENCIO BACILIO AKA FLORENCIO BACILIO RAMIREZ AND YOLANDA BACILIO, Appellees**

---

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-44475**

---

## MEMORANDUM OPINION

Harris County appeals the trial court's order denying its plea to the jurisdiction based on governmental immunity. The county sued Florencio Bacilio aka Florencio Bacilio Ramirez and Yolanda Bacilio for property damages arising from a motor

vehicle accident involving Florencio and a Harris County Sheriff's Deputy. After the Bacilios asserted claims against Harris County, the county moved to dismiss all the claims against it based on governmental immunity. In its sole issue, Harris County contends that the trial court erred in denying its plea because the deputy was entitled to official immunity as a matter of law and therefore the county did not waive its governmental immunity. We affirm in part, and reverse and remand in part.

## Background

This case arises from an automobile collision between Florencio and Harris County Sheriff's Deputy Laneka Winters.[1] Harris County filed suit against Florencio and Yolanda, the owner of the vehicle involved in the collision, asserting claims for negligence against the Bacilios and negligence per se against Florencio. Harris County alleged that Florencio failed to stop his vehicle and yield the right of way to Deputy Winters, who was in pursuit of a fleeing felon and had activated her emergency lights and siren, causing the collision. Harris County sought to recover the damages sustained to the county-owned patrol vehicle operated by Deputy Winters.

---

[1] Deputy Winters, whose last name was Cole at the time of the accident, currently works as an investigator for the Harris County District Attorney.

After they answered the lawsuit, the Bacilios filed an original petition in intervention[2] asserting claims against Harris County under the Texas Tort Claims Act. In their amended petition, they alleged that Deputy Winters caused the accident and that Harris County was vicariously liable for the deputy's negligence and negligence per se. The Bacilios sought personal injury and property damages in an amount over $200,000 but not more than $1,000,000.

Harris County answered asserting a general denial and affirmative defenses, including official and governmental immunity. Harris County filed a plea to the jurisdiction arguing that it was immune from all affirmative claims against it. In its

---

[2] "An intervention is an equitable motion filed by a *nonparty* voluntarily seeking to become a party in a pending suit to protect the *nonparty's* own rights." *In re H.G.*, 267 S.W.3d 120, 122 n.1 (Tex. App.—San Antonio 2008, pet. denied) (emphasis added); *see also Paxton v. Simmons*, 640 S.W.3d 588, 597 (Tex. App.—Dallas 2022, no pet.). The Bacilios, as the named defendants in Harris County's suit, are therefore not intervenors. Although their pleading is entitled "Petition in Intervention," we will treat their pleading—which asserts claims against Harris County arising out of the occurrence that is the subject matter of Harris County's suit—as a counterclaim. *See* TEX. R. CIV. P. 97 (stating counterclaim is "claim within the jurisdiction of the court, not the subject of a pending action, which at the time of filing the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction"); TEX. R. CIV. P. 71 ("When a party has mistakenly designated any plea or pleading, the court, if justice so requires, shall treat the plea or pleading as if it had been properly designated."); *Hodge v. Smith*, 856 S.W.2d 212, 214 (Tex. App.—Houston [1st Dist.] 1993, writ denied) ("The titles of the pleadings and other court documents are not controlling. We are to look at the substance of the pleadings and proceedings to determine what actually occurred.").

3

amended plea, Harris County argued that because Deputy Winters was entitled to official immunity and could not be held liable to the Bacilios under Texas law, Harris County retained its governmental immunity. In support of its argument, the county attached as exhibits to its plea Deputy Winters's unsworn declaration, an Incident/Accident Report, and a thumbnail drive containing a compilation of dash cam video from Deputy Winters's vehicle and the vehicles of several other officers involved in the pursuit.

The Bacilios responded to the county's plea arguing that Harris County was attempting to use its sovereign immunity to sue them for property damage while at the same time prevent them from countersuing for negligence and defending themselves. They argued that whether the "emergency exception" to the TTCA's waiver of governmental immunity applied in this case was an issue for the factfinder.[3] The Bacilios objected to the evidence attached to the county's amended plea and sought leave to finalize discovery.

---

[3]     Section 101.055 of the Texas Tort Claims Act (TTCA) applies to claims against a governmental unit arising "from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others." TEX. CIV. PRAC. & REM. CODE § 101.055(2).

Harris County replied arguing that the Bacilios' objections to the exhibits attached to the county's amended plea were without merit. The county urged the trial court to grant its amended plea and dismiss the affirmative claims against it.

Following a hearing[4] on the amended plea, the trial court ordered the parties to provide additional briefing on the following issues: (1) whether the fact that Harris County brought the lawsuit regarding the accident affects the court's decision on the plea to the jurisdiction in any way; (2) whether the lawsuit waives the county's immunity; (3) whether granting the plea to the jurisdiction allows for an offset by the defendant/counterclaimant for his injuries/damages.

Harris County filed its first amended petition seeking recovery against the Bacilios in the amount of $4,298.32 for damages to the county-owned vehicle.

In its additional briefing, Harris County acknowledged the rule enunciated by the Texas Supreme Court in *Reata Construction Corp. v. City of Dallas*, 197 S.W.3d 371 (Tex. 2006), that a governmental entity that voluntarily chooses to assert a claim for damages "does not have immunity from suit as to [] claims which are germane to, connected with, and properly defensive to the [entity's] claims, to the extent [those] claims offset those asserted by the [entity]." *Id.* at 373. It argued, however, that the rule is narrow and the Legislature has precluded claims against Harris County because its employee, Deputy Winters, is entitled to official immunity. Thus,

---

[4]    The appellate record does not include a record of the hearing.

5

it reasoned, the *Reata* rule does not provide an exception to the TTCA's immunity bar and has no application in this case.

The Bacilios argued that *Reata*'s holding applies with equal force to the facts in this case. They argued that, under *Reata*, when Harris County sued them it subjected itself to the jurisdiction of the trial court and waived its governmental immunity from suit as to their claims germane to the matter in controversy.

The trial court denied Harris County's amended plea to the jurisdiction on June 25, 2023. This interlocutory appeal followed.

## Discussion

Harris County contends that the trial court erred in denying its plea to the jurisdiction because Deputy Winters was entitled to official immunity and, therefore, the county's governmental immunity was not waived under the TTCA. It argues that the evidence shows that Deputy Winters was entitled to official immunity from liability because she was acting in the scope of her authority and was performing a discretionary duty in good faith at the time of the accident, and the Bacilios have not come forth with any evidence creating a fact issue as to any of these elements. It asserts that while *Reata* affects our decision, it does not preclude granting relief to Harris County.

The Bacilios respond that Harris County waived its official immunity when it sued them for property damage following the collision. They further argue that the

video evidence arguably demonstrates that the emergency exception to the TTCA's waiver of immunity does not apply and that, in any case, the evidence raises genuine issues of material fact reserved solely for the factfinder.

## A. Standard of Review

Subject matter jurisdiction is essential to a court's power to decide a case. *City of Hous. v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013) (per curiam); *City of DeSoto v. White*, 288 S.W.3d 389, 393 (Tex. 2009). To establish subject matter jurisdiction, a plaintiff must allege facts that affirmatively demonstrate the court's jurisdiction to hear the claim. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019). Governmental immunity from suit will defeat a trial court's subject matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Meyers v. JDC/Firethorne, Ltd.*, 548 S.W.3d 477, 484 (Tex. 2018); *see Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). A plaintiff bears the burden of establishing a waiver of immunity. *See Rattray v. City of Brownsville*, 662 S.W.3d 860, 865-66 (Tex. 2023); *Dall. Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003).

A governmental unit challenging whether a claimant has met this burden may by a plea to the jurisdiction contest the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). When, as here, a plea to the jurisdiction challenges the existence of jurisdictional

7

facts, we look beyond the pleadings and consider evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, even if the evidence implicates both the court's jurisdiction and the merits of a claim. *Miranda*, 133 S.W.3d at 227. Our standard of review generally mirrors that of a traditional summary judgment: A plaintiff must raise a genuine issue of material fact to overcome the challenge to the trial court's jurisdiction. *Id.* at 221, 228. In determining whether a plaintiff has met that burden, we take as true all evidence favorable to the plaintiff and indulge every reasonable inference and resolve any doubts in the plaintiff's favor. *Id.* at 228. If the evidence and allegations create a fact question regarding jurisdiction, then a court cannot grant a plea to the jurisdiction, and the factfinder must resolve the fact issue. *Id.* at 227–28. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, then a court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228. Because a plea to the jurisdiction raises questions of law, we apply de novo review. *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 731 (Tex. 2020).

## B. The Bacilios' Claims

Harris County sued the Bacilios for their alleged negligence in causing the accident that damaged the county-owned vehicle that Deputy Winters was driving. The Bacilios counterclaimed asserting that Deputy Winters caused the accident and that Harris County was vicariously liable for the deputy's negligence and negligence

per se. The Bacilios sought recovery from the county for personal injuries and damages to the vehicle Florencio was driving.

The common law doctrine of governmental immunity protects political subdivisions of the state from suit when they perform governmental functions. *See Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003). It is the Legislature's sole prerogative to decide whether and to what extent immunity should be waived. *See Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017); *Reata*, 197 S.W.3d at 375; *City of Austin v. Utility Assocs., Inc*., 517 S.W.3d 300, 313 (Tex. App.—Austin 2017, pet. denied). The Legislature may waive sovereign immunity, but because it is a common law doctrine, it is "the judiciary's responsibility" "to determine under what circumstances sovereign immunity exists in the first instance." *Garcia v. City of Willis*, 593 S.W.3d 201, 208–09 (Tex. 2019) (quoting *Reata*, 197 S.W.3d at 375).

Exercising this responsibility, the Texas Supreme Court in *Reata* determined that when a governmental entity subjects itself to court jurisdiction by asserting claims for monetary recovery, it "does not have immunity from suit for monetary claims against it that are 'germane to, connected with, or properly defensive to' affirmative claims made by the entity," to the extent that the claims against the entity offset the entity's own claims. 197 S.W. 3d at 378; *see also City of Dall. v. Albert*, 354 S.W.3d 368, 372 (Tex. 2011). This is not because a governmental entity

9

"waives" its immunity by filing a claim for affirmative relief. *Borunda Holdings, Inc. v. Lake Proctor Irrigation Auth. of Comanche Cnty.*, 540 S.W.3d 548, 550 (Tex. 2019) (per curiam) (discussing *Reata*, 197 S.W.3d at 376–77). Rather, the scope of governmental immunity "simply does not reach the defensive counterclaims to the extent that any recovery on the counterclaims serves as an 'offset' against the government's recovery." *Id.* (discussing *Reata*, 197 S.W.3d at 376-77).

The Fourteenth Court of Appeals recently decided a case similar to the one before us. In *Harris County v. Mireles*, 672 S.W.3d 663 (Tex. App.—Houston [14th Dist.] 2023, pet. filed), the county sued Mireles for damages arising from a car accident involving Mireles and a Harris County Deputy Constable. *See id.* at 669. After Mireles counterclaimed, Harris County filed a plea to the jurisdiction claiming governmental immunity based on the deputy's official immunity and supported the plea with the deputy's unsworn declaration. *See id.* The trial court denied the county's jurisdictional plea. *See id.*

Relying on the reasoning in *Reata*, the Fourteenth Court of Appeals explained:

When Harris County filed suit against [Mireles], it chose "to engage in litigation to assert affirmative claims for monetary damages" and "presumably . . . made a decision to expend resources to pay litigation costs." Once the county asserts affirmative claims for monetary recovery, it must participate in the litigation process as an ordinary litigant." It then "leave[s] its sphere of immunity from suit" for offsetting damage claims against it which are germane to, connected with and properly defensive to the claims the county asserts.

*Id.* at 671 (quoting *Reata*, 197 S.W.3d at 376–77). Concluding that Mireles's counterclaim was "germane to, connected with, and properly defensive to" Harris County's claim, the court held that the trial court properly denied Harris County's plea to the jurisdiction as to the part of Mireles's counterclaim for damages that would offset, in whole or in part, any recovery by Harris County. *See id.*[5] It further held, however, that Harris County retained its immunity from Mireles's damage claims to the extent his damages exceed an amount sufficient to offset the county's damages against him, and its immunity was not waived in that regard. *See id.* at 681.

We agree with the court's reasoning in *Mireles*. Here, Harris County sued the Bacilios for negligence and sought to recover property damages to the city-owned vehicle operated by Deputy Winters. The Bacilios sued the county seeking to recover damages for personal injury and property damage sustained in the collision. The Bacilios' claims are "germane to, connected with, and properly defensive to" Harris

---

[5]     Mireles's wife and Colonial County Mutual Insurance Company filed petitions in intervention also seeking recovery from Harris County based on the deputy's alleged negligence. *Harris Cnty. v. Mireles*, 672 S.W.3d 663, 669–70 (Tex. App.— Houston [14th Dist.] 2023, pet. filed). The court noted that, "[b]y filing suit, Harris County chose to litigate and spend public money on pursuing claims against [Mireles]. It did not, however, "choose to sue the intervenors, nor did it choose to spend public money defending the intervenors' claims." *Id.* at 673. The court reasoned that "[d]isregarding the doctrine of immunity in connection with the county's defense of those claims is not consistent with *Reata*'s reasoning." *Id.* Concluding that the intervenors' claims were "within the sphere of Harris County's governmental immunity," and *Reata* did not apply to those claims, it held that the county could properly invoke immunity against the intervenors' claims. *See id.*

11

County's claims against them, and they allege, at least in part, offsetting damages. Harris County's claims against the Bacilios, and the Bacilios claims for offsetting damages against the county, clearly implicate *Reata*'s holding. Harris County's plea to the jurisdiction did not effectively invoke immunity against the Bacilios' defensive and offsetting damage claims because there exists no immunity to invoke against those claims. *See id.* at 672.

Harris County, however, continues to have immunity from the Bacilios' affirmative damage claims against it for monetary relief exceeding amounts necessary to offset the county's claims. *Reata*, 197 S.W.3d at 377 ("[O]nce it asserts affirmative claims for monetary recovery, the City must participate in the litigation process as an ordinary litigant, save for the limitation that the City continues to have immunity from affirmative damage claims against it for monetary relief exceeding amounts necessary to offset the City's claims."). Thus, for the Bacilios to sue for and recover damages exceeding the amount necessary to offset any recovery against them by the county, they must demonstrate a waiver of the county's immunity. *See Rattray*, 662 S.W.3d at 865-66. We must therefore determine whether Harris County conclusively proved the affirmative defense of official immunity and whether the Bacilios raised a fact question regarding that defense.

## C. Official Immunity

Harris County, as a political subdivision of the state, cannot be liable for an employee's wrongful acts unless its governmental immunity has been waived. *See City of Pasadena v. Belle*, 297 S.W.3d 525, 529 (Tex. App.—Houston [14th Dist.] 2009, no pet.). The TTCA waives a governmental unit's immunity from suit for personal injury and property damage proximately caused by the wrongful act or negligence of employees acting within the scope of their authority if the injuries arise from the operation or use of motor-driven vehicles. *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1); *see Sampson v. Univ. of Tex. at Austin*, 500 S.W.3d 380, 384 (Tex. 2016). This waiver of immunity applies if the employee would be personally liable to the claimant according to Texas law. *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1)(B), (2).[6] The TTCA's personal liability requirement

---

[6]     The TTCA provides, in relevant part:

A governmental unit in the state is liable for:

> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

>> (A) the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

>> (B) the employee would be personally liable to the claimant according to Texas law.

13

narrows the scope of the waiver by ensuring that when a governmental unit employee is immune from suit the governmental unit likewise remains immune from suit. *See City of San Antonio v. Riojas*, 640 S.W.3d 534, 537 (Tex. 2022) ("If [an] employee is protected from liability by official immunity, the employee is not personally liable to the claimant and the government retains its sovereign immunity under [Section 101.021(1)]."); *Martinez v. Harris Cnty.*, 526 S.W.3d 557, 562 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

In its plea to the jurisdiction and on appeal, Harris County argues that Deputy Winters was entitled to official immunity from the Bacilios' claims. To prove the affirmative defense of official immunity, Harris County had the burden to establish all of its elements, namely, that Deputy Winters was (1) acting within the scope of her authority, (2) performing a discretionary duty, and (3) acting in good faith. *See Tex. Dep't of Pub. Safety v. Bonilla*, 481 S.W.3d 640, 642–43 (Tex. 2015) (per curiam); *Wadewitz v. Montgomery*, 951 S.W.2d 464, 465–66 (Tex. 1997); *Tex. Dep't of Pub. Safety v. Johnson*, No. 01-20-00397-CV, 2022 WL 3452264, at *4 (Tex. App.—Houston [1st Dist.] Aug. 18, 2022, no pet.) (mem. op.); *see also Riojas*, 640 S.W.3d 537–38 ("Official immunity is an affirmative defense that 'inures to all governmental employees who perform discretionary functions in good faith and within their authority.'") (citing *City of Lancaster v. Chambers*, 883 S.W.2d 650,

---

TEX. CIV. PRAC. & REM. CODE § 101.021(1); *see id.* § 101.025(a).

653 (Tex. 1995)). "[O]fficial immunity is designed to protect public officials from being forced to defend their decisions that were reasonable when made, but upon which hindsight has cast a negative light." *Telthorster v. Tennell*, 92 S.W.3d 457, 463 (Tex. 2002). If the governmental employee is protected from liability by official immunity, then the governmental employer is shielded from liability by governmental immunity. *Clark*, 38 S.W.3d at 580.

### 1. Acting Within Scope of Authority

The first element—whether the officer was acting within the scope of her authority—denotes "the performance for a governmental unit of the duties of an employee's office or employment and includes being in or about the performance of a task lawfully assigned to an employee by competent authority." TEX. CIV. PRAC. & REM. CODE § 101.001(5). A peace officer who discharges duties generally assigned to her acts within the course and scope of employment. *Chambers*, 883 S.W.2d at 658; *Junemann v. Harris Cnty.*, 84 S.W.3d 689, 693 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

In her declaration, Deputy Winters testified that, on March 14, 2018, she was employed by Harris County as a deputy sheriff and assigned as a contract patrol deputy to the Windsong Subdivision in West Harris County. One of her duties as patrol deputy is to assist other officers in the execution of their duties. Winters

15

testified that she received an MDT[7] message from Deputy Hernandez asking her to drive to a suspect's home in the Windsong subdivision to determine whether the suspect, Daniel Castillo, was at home. While en route to Castillo's home, Deputy Mora radioed that he was actively pursuing Castillo. When she received the transmission, Deputy Winters immediately activated her emergency lights and siren and joined the pursuit. We note that the Bacilios also alleged in their petition that Deputy Winters was acting within the scope of her authority when the accident occurred. We conclude that Deputy Winters was acting within the scope of her authority at the time of the accident. *See Chambers*, 883 S.W.2d at 658; *Junemann*, 84 S.W.3d at 693.

## 2. Discretionary Duty

The second element inquires whether the officer was performing a discretionary duty. "If an action involves personal deliberation, decision and judgment, it is discretionary; actions which require obedience to orders or the performance of a duty to which the actor has no choice, are ministerial." *Chambers*, 883 S.W.3d at 654. The Texas Supreme Court has held that an officer's decision to engage in pursuit is a discretionary function:

> The decision to pursue a particular suspect will fundamentally involve the officer's discretion, because the officer must, in the first instance, elect whether to undertake pursuit. Beyond the initial decision to

---

[7] MDT refers to a mobile data terminal.

16

engage in the chase, a high[-]speed pursuit involves the officer's discretion on a number of levels, including, which route should be followed, at what speed, should back-up be called for, and how closely should the fleeing vehicle be pursued.

*Id.* at 655.

Deputy Winters testified that as she was driving to Castillo's home, she heard Deputy Mora's radio call that he had located Castillo and was actively pursuing him. Deputy Winters testified that, upon receiving the call—which was a "Priority One" call with the highest level of importance and need for an urgent response—she determined that she should assist Deputy Mora in apprehending Castillo. Deputy Winters testified that she exercised her discretion in determining the route she took, the speed at which she traveled, whether to pass other vehicles, whether to disregard a traffic control device, and other similar decisions. She testified that, under some circumstances, an officer may exercise discretion to call off a pursuit but that, in this case, she and the other deputies and troopers exercised their discretion to continue the pursuit. The Bacilios do not contend that Deputy Winters was not performing a discretionary act by engaging in the pursuit. We conclude that Deputy Winters's pursuit of Castillo was a discretionary act. *See id.*; *City of Hous. v. Hatton*, No. 01-11-01068-CV, 2012 WL 3528003, at *3 (Tex. App.—Houston [1st Dist.] Aug. 16, 2012, pet. denied) (mem. op.) (responding to "Priority One" call for assistance and using emergency lights and sirens was discretionary act when accident occurred); *see also City of Hous. v. Nicolai*, No. 01-20-00327-CV, 2023 WL 2799067, at *5

17

(Tex. App.—Houston [1st Dist.] Apr. 6, 2023, pet. filed) ("Examples of an officer's discretionary activities include high-speed chases, investigations, traffic stops, and the decision to violate traffic laws to quickly reach the scene of suspected criminal activity or assist another officer there.").

### 3. Good Faith

The third element requires Harris County to establish that Deputy Winters was acting in good faith.

#### a. Governing Law

"Good faith is a test of objective legal reasonableness." *Bonilla*, 481 S.W.3d at 643. The test for good faith is whether a reasonably prudent government employee, under the same or similar circumstances, could have believed that the need for the officer's actions outweighed a clear risk of harm to the public from those actions. *Id.*; *Martinez*, 526 S.W.3d at 562 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Under this objective standard, the government employee's subjective state of mind or motive is irrelevant. *Bonilla*, 481 S.W.3d at 643–44; *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 426–27 (Tex. 2004).

The Supreme Court of Texas has identified several factors that courts should consider when assessing a law enforcement officer's good faith in the context of a police pursuit. *See Clark*, 38 S.W.3d at 580–83. In analyzing law enforcement's need to intervene, we consider the seriousness of the crime to which the officer responded,

18

whether the officer's immediate presence was necessary to prevent injury or loss of life or to apprehend a suspect, and any alternative courses of action that may have been available to achieve a comparable result. *Id.* at 581; *Wadewitz*, 951 S.W.2d at 467. Against these considerations, we balance the risks the pursuit entailed, the likelihood that these risks could have been realized, and whether these risks would be clear to a reasonably prudent officer. *Clark*, 38 S.W.3d at 581–82. However, we bear in mind that the circumstances may prevent an officer from being able to analyze thoroughly each factor affecting the needs and risks associated with a pursuit, and that this inability does not preclude a finding of good faith. *Id.* at 583. Good faith does not require consideration of risks that did not exist in a particular case. *Id.* at 586. An assessment of road, weather, and traffic conditions may suffice if the record does not indicate that other circumstances affected the risks. *Id.*

This inquiry does not concern carelessness or negligence, *see Ballantyne*, 144 S.W.3d at 426, and evidence of negligence does not negate good faith. *Telthorster*, 92 S.W.3d at 467. The question is not what a reasonable person would have done, but rather what a reasonable person could have believed. *Ballantyne*, 144 S.W.3d at 426. In this regard, the good faith standard is akin to the standard of review for abuse of discretion; only those who are "plainly incompetent" or "knowingly violate the law" lack the good faith necessary to be shielded by official immunity. *Riojas*, 640

19

S.W.3d at 539 (quoting *Bonilla*, 481 S.W.3d at 643); *see also City of San Antonio v. Ytuarte*, 229 S.W.3d 318, 321 (Tex. 2007) (per curiam).

When the record contains competent proof of good faith and the other elements of official immunity, the burden shifts to the plaintiff to introduce controverting proof that no reasonable person in the officer's position could have thought the circumstances justified his actions. *Clark*, 38 S.W.3d at 581; *Adams v. Downey*, 124 S.W.3d 769, 772 (Tex. App.—Houston [1st Dist.] 2003, no pet.). This burden may be satisfied by presenting expert or other testimony that balances both the need and risk factors described above to conclude that no reasonably prudent officer could have believed the actions were justified. *See Ytuarte*, 229 S.W.3d at 321 (stating that expert testimony on good faith "must consider both the need and risk factors to prove the expert had a suitable basis for concluding that a reasonable prudent officer in the same position could or could not have believed the actions were justified," and holding that because plaintiff's expert "assessed the risks but never considered the need factor," plaintiff's summary judgment evidence was insufficient to controvert city's evidence on good faith element); *Jackson v. City of Baytown*, No. 14-14-00231-CV, 2015 WL 2169509, at *6 (Tex. App.—Houston [14th Dist.] May 7, 2015, no pet.) (mem. op.) (considering plaintiff's expert report and deposition testimony, as well as applicable police department orders and procedures, offered by plaintiff to refute city's proof of good faith).

20

**b.     Analysis**

In support of its good faith argument, Harris County points to Deputy Winters's declaration and the dash cam video.

Deputy Winters testified that she began her law enforcement career in 2011. When she was hired as a deputy/police officer in 2015, she underwent field training with an experienced deputy. Once she was released from field training, she was competent to operate as a solo patrol deputy. Officer Winters received her Basic Peace Officer license in June 2015, her Intermediate Peace Officer license in May 2017, and her Advanced Peace officer license in March 2022.  As of May 2023, she had completed 2,173 hours of various law enforcement training since she began her law enforcement career. In addition to Professional Police Driving and Patrol Skills training required in the Basic Peace Officer course, Officer Winters completed 66 hours of additional training in patrol procedures, driving, and traffic enforcement and stops between June 2015 and April 2021.

On the day of the accident, Deputy Winters was working as a patrol deputy and assigned to work under a contract between the Harris County Sheriff's Office and the Windsong Subdivision. Her shift began at 2:00 p.m. and ended at 10:00 p.m.

Deputy Winters testified that she received a message from Deputy Hernandez asking her to go to the home of a suspect, Castillo, to see if he was there because he was suspected of committing numerous felonies, including several vehicular

21

robberies. While Deputy Winters was en route to Castillo's home, Deputy Mora radioed that he was actively pursuing Castillo. Deputy Winters testified that this was a Priority One call, which is a call with the highest level of importance and need for an urgent response.

In response to the call, Deputy Winters immediately activated her emergency lights and siren and headed toward the pursuit. Deputy Winters testified that she located the pursuing units near the intersection of West Little York Road and Queenston Boulevard. A Department of Public Safety (DPS) trooper was leading the pursuit, and Deputy Mora was calling the pursuit as the primary responder. Deputy Winters was the fourth police vehicle in the pursuit.

Deputy Winters testified that Castillo led the pursuing police cars on a long and circuitous route. After driving through the parking lot of the Church Without Walls at 5725 Queenston Boulevard, Castillo emerged back onto Queenston and headed southbound. After making various turns onto several streets, Castillo approached the intersection of Queenston and Kieth Harrow where he drove over the median and began heading southbound on Queenston. Deputy Winters testified that after Castillo executed the U-turn, she became the primary unit pursuing the suspect and she began radioing the suspect's direction of travel.

Deputy Winters testified that as Castillo continued his circuitous route, he eventually turned right on Kieth Harrow and headed east. As Deputy Winters

approached the same intersection at which Castillo had turned right, she saw two patrol vehicles stopped in the lefthand lane and the left turn lane of Kieth Harrow, and a beige pickup truck in the righthand lane of Kieth Harrow heading eastbound. Deputy Winters testified that she slowed her patrol car but did not come to a complete stop. Her emergency lights and siren were still on. Deputy Winters testified that because the beige pickup truck appeared to be stopping at the intersection, she believed that it was safe to turn right onto Kieth Harrow and continue the pursuit. However, the beige pickup truck driven by Florencio did not stop and Deputy Winters struck the vehicle. Deputy Winters stopped her pursuit to assist Florencio. The dash cam video from Winters's patrol car and those of several other pursuing officers shows the two deputies stopped in the left turn and lefthand lanes and Florencio's truck slow down and nearly stop before it accelerates past the stopped patrol cars where it is struck by Deputy Winters.

Regarding risk to the public, Deputy Winters testified that there are always risks when law enforcement is engaged in a vehicle pursuit, and an automobile collision is one of the most common. However, she testified that her extensive training and experience informed her that while the risk of a collision in this case existed, the risk of serious collision was slight for several reasons. First, the conditions were good—it was a bright, sunny day, the sky was clear, and the roads were dry. Additionally, the traffic appeared lighter than normal because schools in

the area were closed for spring break, and there was little to no pedestrian traffic. Second, the deputies and troopers engaged in the pursuit exercised restraint and caution throughout the pursuit while Castillo drove unsafely and erratically. Deputy Winters testified that when Castillo made an unsafe turn or erratic move, the officers did not mirror his action but rather changed position in the pursuit order to continue pursuing Castillo safely and minimize risk. Third, many units tried to anticipate Castillo's actions and clear lanes of traffic or stop cross-traffic at intersections to avoid collision with third parties. Their efforts included readying spike strips to stop Castillo, placing officers in positions to control traffic or employ spike strips, and using a helicopter to keep track of Castillo and direct officers to intersections. Fourth, Deputy Winters testified that, from what she saw that day, all the units involved in the pursuit were using emergency lights and sirens to give third parties warning to look and react safely. Deputy Winters testified that while two accidents occurred during the 38-minute pursuit—the one involving Florencio and another when Castillo failed to complete a right turn and struck the side of a truck whose driver estimated that the damage to his truck totaled $1,000—they were minor accidents.

As to the need for law enforcement to intervene, Deputy Winters testified that she assessed the need for police intervention and pursuit. She testified that just before the pursuit began, Deputy Mora had located Castillo's vehicle and approached it to detain him but Castillo accelerated and drove away. At the time this occurred,

24

Castillo was suspected of committing several serious crimes, including breaking into and robbing several vehicles in a shopping center parking lot in broad daylight, felony evading arrest, and failing to stop and give information following an accident. According to Deputy Winters, Castillo's speed during the pursuit reached between 65 and 90 miles per hour. He wove through traffic, drove through ditches and over medians at times during his evasion, drove off the road parallel to a bayou during the pursuit, and passed through traffic control signs without stopping. Deputy Winters testified that during the pursuit two deputies noted that Castillo swerved his vehicle toward them when they tried to deploy spike strips. Deputy Winters testified that Castillo's erratic driving without regard to the public demonstrated an increasing need to apprehend him because it was apparent that Castillo had no intention of complying with law enforcement and had no regard for the welfare of others. *See Johnson*, 2022 WL 3452264, at *7 (concluding evidence showed that driver who accelerated away from trooper, ran multiple stop signs, failed to signal lane changes and turns, and failed to keep his lane demonstrated need for police intervention to apprehend driver); *Jackson,* 2015 WL 2169509, at *4 (finding need for police intervention was demonstrated where officer testified that driver violated multiple traffic laws in effort to evade stop and was driving recklessly).

Deputy Winters also testified that she could not think of any alternatives to the course of action she took under the circumstances that she knew at the time. She

testified that while one option would have been to allow Castillo to evade apprehension, acquire an arrest warrant, and then wait for him at his home, this was not the best option because it was not clear that police knew with absolute certainty who the driver was and the conditions at the time of the pursuit were favorable for avoiding serious accidents. Further, Deputy Winters testified that this was her patrol area and she was familiar with the roads and the general traffic patterns, and she believed that her knowledge of the area would help end the pursuit in a safe manner. For these reasons, she concluded that there was no better course of action to apprehend Castillo. *See Johnson*, 2022 WL 3452264, at *7 (concluding that trooper's affidavit testimony showed he considered alternative course of action of terminating pursuit but concluded that alternative posed high degree of risk to public because driver of suspect car was evading traffic stop and traveling at unsafe speed); *Harris Cnty. v. Avila*, No. 14-18-00182-CV, 2019 WL 1030332, at *5 (Tex. App.—Houston [14th Dist.] Mar. 5, 2019, no pet.) (mem. op.) (finding officer's testimony that he considered abandoning pursuit or reducing speed but concluded these alternatives would have "impeded [officer's] effort to contain the suspect, whose hazardous driving already presented an immediate danger to others," demonstrated that officer considered alternative courses of action to pursuit).

Deputy Winters testified that she constantly evaluated the risks of her course of action against the need for her action. During the pursuit, she changed her tactics,

including her speed, direction, and lane usage. Deputy Winters testified that the driver of the beige pickup (Florencio) appeared to stop despite having the green light. When Castillo ran the red light, Deputy Winters slowed down, believing that the pickup truck would stay put as there was a line of pursuing patrol vehicles following Castillo, but instead he accelerated through the intersection. Deputy Winters believed that the need to subdue and apprehend Castillo outweighed the risks of harm to the public. *See Johnson*, 2022 WL 3452264, at \*7 (concluding that trooper's testimony and dash cam video showing that roads were dry and visibility was clear throughout pursuit, streets were well lit and traffic was relatively light, that trooper activated his lights and siren when pursuit began and kept them on throughout pursuit, and that trooper slowed down as he approached intersections with stop signs demonstrated that trooper assessed the risks of pursuit); *Avila*, 2019 WL 1030332, at \*5 (concluding officer assessed risks of pursuit by taking into consideration weather, lighting, and traffic, and by activating his lights and sirens); *Jackson*, 2015 WL 2169509, at \*4 (concluding evidence showed officer assessed risks of pursuit by considering weather, visibility, and traffic conditions, activating his lights and sirens throughout pursuit, and slowing as he approached intersections with red lights or stop signs); *Royal v. Harris Cnty.*, No. 14-08-00551-CV, 2010 WL 610604, at \*5 (Tex. App.—Houston [14th Dist.] Feb. 23, 2010, pet. denied) (mem. op.) (concluding county's evidence indicating officer assessed road conditions, weather,

time of night, lighting, and traffic conditions was sufficient to demonstrate officer considered risk factors associated with pursuit).

Based on this evidence, we conclude that Harris County met its burden of showing that a reasonably prudent officer, under the same or similar circumstances, could have believed that the need to apprehend Castillo outweighed the risks of harm to the public. *See Ytuarte*, 229 S.W.3d at 321 (concluding evidence established good faith as matter of law where officer testified he had evaluated both needs and risks); *see also Johnson*, 2022 WL 3452264, at *8; *Avila*, 2019 WL 1030332, at *5; *Jackson*, 2015 WL 2169509, at *4.

## 4.    The Bacilios' Response

Because Harris County satisfied its initial burden of showing that Deputy Winters acted in good faith, the burden shifted to the Bacilios to present controverting evidence that no reasonable person in Deputy Winters's position could have thought the circumstances justified her actions. *See Clark*, 38 S.W.3d at 581.

In their response to the county's amended plea and on appeal, the Bacilios do not address good faith or any of the elements of Harris County's official immunity defense, nor did they present any controverting evidence raising a genuine issue of material fact. Instead, they argue that Harris County's position that Deputy Winters was entitled to official immunity because she performed a discretionary function, within the scope of her authority, and acted in good faith, does not counteract the

28

waiver of official immunity as a matter of law under *Reata.* As we explained above, Harris County is not entitled to immunity against the Bacilios' defensive and offsetting damage claims but it continues to have immunity from the Bacilios' affirmative damage claims against it for monetary relief exceeding amounts necessary to offset the county's claims, unless the Bacilios demonstrate a waiver of the county's immunity. Because Deputy Winters is protected from personal liability based on official immunity, and the Bacilios did not introduce controverting proof raising a genuine issue of material fact, Harris County retains its governmental immunity with respect to the Bacilios' claim for monetary relief exceeding amounts necessary to offset the county's claim. *See* TEX. CIV. PRAC. & REM. CODE § 101.021(1)(B); *Johnson*, 2022 WL 3452264, at *10 ("Because Trooper Rodriguez is protected from personal liability based on official immunity, DPS is protected from liability under the TTCA.") (citing *Clark*, 38 S.W.3d at 580)).

The Bacilios also argue that, in any case, Harris County must still contend with Section 101.055(2) of the TTCA, the emergency exception to the waiver of sovereign immunity, which they argue only applies if Deputy Winters's actions were "in compliance with the laws and ordinances applicable to emergency action, or in the absence of such a law or ordinance, if the action is not taken with conscious indifference or reckless disregard for the safety of others." TEX. CIV. PRAC. & REM. CODE § 101.055(2). The Bacilios assert, in conclusory fashion, that the dash cam

video "arguably establishes that the deputy was not in compliance with laws or ordinances applicable to the emergency action, and her actions were taken with either conscious indifference or reckless disregard for the safety of others.[8] This argument fares no better. The emergency exception under Section 101.055(2) is an exception to the limited waiver of immunity under Section 101.021. *See City of Hous. v. Vogel*, 01-22-00071-CV, 2022 WL 16756378, at *3 (Tex. App.—Houston [1st Dist.] Nov. 8, 2022, no pet.) (mem. op.) (recognizing Section 101.055(2) as exception to limited waiver of immunity under TTCA); *City of Hous. v. Davis*, No. 01-13-00600-CV, 2014 WL 1678907, at *4 (Tex. App.—Houston [1st Dist.] Apr. 24, 2014, pet. denied) (mem. op.) (stating TTCA enumerates exceptions to waiver of immunity, including "emergency exception" in Section 101.055(2)). Having concluded that Harris County retained—and did not waive—its governmental immunity under Section 101.021(1) of the TTCA, we need not consider whether the County would also retain its immunity under Section 101.055(2). Accordingly, we sustain in part, and overrule in part, the County's issue.

## Conclusion

Because Harris County asserted an affirmative claim for monetary relief against the Bacilios, the county does not have immunity from the Bacilios' claims

---

[8] In their brief, the Bacilios do not identify the law or ordinance with which they contend Deputy Winters failed to comply.

30

germane to, connected to, and properly defensive to the claim asserted by Harris County, to the extent any recovery on the Bacilios' claims will offset any potential recovery by the county. However, Harris County retains its immunity from the Bacilios' claims to the extent their damages exceed an amount sufficient to offset the county's damages, and its immunity has not been waived in that regard. Accordingly, we affirm in part and reverse and remand in part to the trial court for further proceedings consistent with this opinion.

Amparo Monique Guerra
Justice

Panel consists of Chief Justice Adams and Justices Guerra and Farris.